**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

|                                        |   |                                           |
|----------------------------------------|---|-------------------------------------------|
| ACCELGOV, LLC,                         | ) |                                           |
|                                        | ) |                                           |
| Plaintiff,                             | ) |                                           |
|                                        | ) |                                           |
| v.                                     | ) | No. 22-1433                               |
|                                        | ) |                                           |
| THE UNITED STATES,                     | ) | Filed: January 31, 2023                   |
|                                        | ) |                                           |
| Defendant,                             | ) | Re-issued: February 17, 2023[*]           |
|                                        | ) |                                           |
| and                                    | ) |                                           |
|                                        | ) |                                           |
| TECHNICAL AND MANAGEMENT               | ) |                                           |
| RESOURCES, INC.,                       | ) |                                           |
|                                        | ) |                                           |
| Defendant-Intervenor.                  | ) |                                           |

## OPINION AND ORDER

Plaintiff, AccelGov, LLC, filed this post-award bid protest challenging the General
Services Administration's ("GSA") decision to award a task order to Defendant-Intervenor,
Technical and Management Resources, Inc. ("TMR"), to provide information technology services
to the Defense Commissary Agency ("DeCA"). AccelGov contends that GSA's award was

---

[*] The Court issued this opinion under seal on January 31, 2023, and directed the parties to
file any proposed redactions by February 8, 2023. AccelGov proposed redactions, to which TMR
has no objections, and the Government proposed a more limited set of redactions fully
encompassed by AccelGov's proposal. Upon review, the Court concludes that some of
AccelGov's proposed redactions are overbroad, as more limited redactions will suffice to protect
the competitive process. Thus, the Court has rejected proposed redactions to the extent they seek
to protect information that was stated in a high level of generality or qualitatively, constituted
attorney argument, or was revealed in other parts of the opinion not marked for redaction.
Additionally, balancing the need to protect competition-sensitive information with the
presumption of access to judicial records, the Court has rejected proposed redactions of
information that is necessary to understand the Court's analysis. Accordingly, this opinion adopts
a subset of AccelGov's proposed redactions and all of the Government's proposed redactions.
Redacted material in charts is blacked out, and redacted material in the body of the opinion is
represented by bracketed ellipses "[. . .]." The Court also has corrected some typographical errors.

arbitrary and capricious because the agency irrationally evaluated AccelGov's technical/management approach. It also argues that TMR's quote contained material misrepresentations regarding TMR's past experience. AccelGov requests that the Court enjoin performance of the task order award, disqualify TMR from consideration, and require GSA to perform another evaluation and issue a new award decision.

Before the Court are the parties' Cross-Motions for Judgment on the Administrative Record and the Government's Motion to Supplement the Administrative Record. For the reasons discussed below, the Court **DENIES** AccelGov's Motion for Judgment, **GRANTS** the Government's and TMR's Cross-Motions, and **DENIES** the Government's Motion to Supplement the Administrative Record.

## I.   BACKGROUND

### A.    The Solicitation

GSA issued Request for Quote No. 47QFHA22Q0005 ("RFQ") on July 12, 2022, seeking proposals for the award of a task order for information technology support to be provided to DeCA. Admin. R. 519–20, ECF No. 25-1 (hereinafter "AR").[1] Headquartered in Fort Lee, Virginia, DeCA manages and operates over 236 grocery stores worldwide with approximately 16,000 employees. AR 191. To support DeCA's operational and information technology objectives, the task order at issue required the contractor to provide "a wide range of services including personnel to support database administration, system administration and operation, system integration, software deployment, technical/customer support, configuration management, security, system tuning, hardware lifecycle management, help desk operations and ticketing application administration." AR 576.

---

[1] For ease of reference, citations to the administrative record refer to the bates-labeled page numbers rather than the ECF page numbers.

Per the RFQ, GSA would use four factors to evaluate quotes.  These factors, in descending order of importance, were as follows: Factor 1 – Technical/Management Approach; Factor 2 – Past Experience; Factor 3 – Socio-Economic status; and Factor 4 – Price.  AR 536–37.  GSA would evaluate offerors under Factor 1 based on "their demonstrated understanding of the task order requirements, the adequacy of the proposed solution/approach, the quality and completeness of their technical solutions to these objectives, and the overall qualifications and skill mix of the contractor workforce proposed to address these task order objectives."  AR 539.  Upon such evaluation, GSA would ascribe to each offeror a rating under Factor 1 using the following scheme:

| Rating | Description |
|---|---|
| Outstanding | Proposal meets requirements and has the following characteristics:<br>–      has multiple strengths and strengths far outweigh any weaknesses, and Risk of unsuccessful performance is low. |
| Good | Proposal meets requirements and has the following characteristics:<br>–      strength(s) outweigh any weakness(es), and Risk of unsuccessful performance is low. |
| Acceptable | Proposal meets requirements and has the following characteristics:<br>–      weaknesses do not outweigh strengths; or has no weaknesses and no strengths, and Risk of unsuccessful performance is no greater than moderate. |
| Marginal | Proposal has any of the following characteristics:<br>–      uncertainty whether it meets requirements,<br>–      weaknesses outweigh strengths, Risk of unsuccessful performance is high. |
| Unacceptable | Proposal does not meet requirements. |

AR 541.

To evaluate offerors under Factor 2, GSA would "consider[] the extent of the offeror's past experience in carrying out similar work" to determine "the offeror's ability to complete a project

with similar scope, size, and duration with minimal risk." AR 538. The RFQ allowed offerors to submit up to three past experience references and required offerors to identify whether they were the prime contractor or a subcontractor for each project. AR 532–33. The RFQ advised that GSA may give prime level experience greater consideration than subcontract level experience. AR 533. It also noted that it would consider the offeror's organizational experience for purposes of evaluating past experience but would not consider the offeror's personnel experience as part of the offeror's organizational experience. *Id.* Upon such evaluation, GSA would ascribe a rating under Factor 2 to each offeror of either "Very Relevant," "Relevant," "Somewhat Relevant," or "Not Relevant." AR 540.

Under Factor 3, GSA would rate each offeror as either "Outstanding," "Good," or "Acceptable" based on the offeror's socio-economic status. AR 539, 541. And under Factor 4, GSA would "consider the level of effort, mix of labor, and whether the total price quoted is reasonable," but it would not score the offeror's price quote. AR 540.

GSA was to award the task order to the offeror that provided the "Best Value" to the Government, "price and other factors considered." AR 541. The best value determination would reflect a "subjective assessment" by GSA "of the quoted solution that provides the optimal results to the Government." AR 542. The RFQ warned that if an offeror received a rating of less than "Acceptable" under any factor, it may not be reviewed any further under the best value determination. AR 538. Because the RFQ would be conducted in accordance with Part 8.4 of the Federal Acquisition Regulations, GSA disclaimed any obligation to determine a competitive range, conduct discussions, or accept revised quotes. AR 542. However, once GSA determined the best-suited offeror, it "reserve[d] the right to communicate with only that Contractor to address any remaining issues, if necessary, and finalize a [task order] with that Contractor." *Id.*

**B.      The Evaluation and Award**

GSA received 11 quotes in response to the RFQ, including quotes from AccelGov and TMR.  AR 927–1032, 2041–2153.  A Technical Evaluation Board ("TEB") evaluated the quotes against the criteria outlined in the RFQ and assigned ratings to each offeror for the first three non-price factors.  AR 2559–60; *see* AR 2218–2535.  The TEB supported its ratings by describing the strengths and weaknesses related to each factor.  AR 2560.  The Contracting Officer ("CO") then conducted an independent best value determination and selected TMR to receive the task order.  AR 2541.  While the CO's analysis relied heavily on the TEB's review, he independently evaluated the quotes and diverged from the TEB's conclusions when he disagreed.  *Compare* AR 2574 (CO rated AccelGov as "Relevant" under Factor 2), *with* AR 2273 (TEB rated AccelGov "Somewhat Relevant" under Factor 2).

The CO gave AccelGov a "Marginal" rating for its technical/management approach (Factor 1), a "Relevant" rating for prior experience (Factor 2), and an "Outstanding" rating for socio-economic status (Factor 3).  AR 2570.  Under Factor 1, the TEB found eight weaknesses associated with AccelGov's proposed approach and no strengths.  AR 2276–79.  The CO's analysis adopted the following four weaknesses from the TEB report:

- "ACCELGOV, LLC's submission did not address all aspects of the PWS [Performance Work Statement], only parroting the PWS without clearly articulating their approach or how they will accomplish the PWS requirements."  AR 2571.

- "They did not provide a complete Phase-In Plan as they simply stated that they will utilize incumbent personnel to perform all tasks identified.  [ACCELGOV] failed to realize that the Field Service Plan and Cyber security are not presently included in the current contract, and therefore these tasks do not have 'incumbent' personnel, therefore their Phase-In plan is not acceptable."  *Id.*

5

- "[ACCELGOV's] Key Personnel plan did not fully meet the Government's need of having certified personnel available to perform on Day 1 of the period of performance."  *Id.*

- "ACCELGOV['s] [f]ield services approach did not fully capture the field service requirements outlined in the PWS, as the PWS requires a dedicated Field Service team, traveling for task C.5.1 (Approx. 10% CONUS/OCONUS per year) traveling for task C.5.2 (approx 10% CONUS/OCONUS per year) and travel for task C.5.4 (approx 70% CONUS/10% OCONUS per year) as detailed in question 11 of the Q&A. ACCELGOV's approach of employing a field service team deploying to [. . .] or in response to [. . .] did not adequately demonstrate there will be a dedicated traveling team for the duration of the contract to provide Field Services On-Site support for Tasks C.5.4.3. (a) through (b) IAW the PWS."  *Id.*

Like the TEB, the CO did not note any strengths for AccelGov's Factor 1 proposal.  *Id.*

The CO rated each quote as follows:

| Name | Factor 1:<br>Technical/Management<br>Approach | Factor 2<br>Past Experience | Factor 3<br>Socio-Economic<br>Status |
|---|---|---|---|
| | Marginal | Not Relevant | Good |
| | Marginal | Relevant | Outstanding |
| | Unacceptable | Not Relevant | Outstanding |
| | Marginal | Not Relevant | Outstanding |
| | Marginal | Relevant | Outstanding |
| | Acceptable | Somewhat Relevant | Good |
| | Marginal | Relevant | Outstanding |
| | Good | Relevant | Outstanding |
| | Marginal | Not Relevant | Good |
| | Outstanding | Relevant | Outstanding |
| | N/A | N/A | N/A |

AR 2665.  After rating each quote, the CO conducted a comparative analysis of the top three quotes submitted by TMR, [. . .], and [. . .] ("[. . .]"), respectively, and concluded that TMR provided the

best value to the Government.  AR 2678.  Because the other responsive quotes received a "Marginal" rating or lower under Factor 1, the CO did not consider them in his comparative analysis, as he found the risk of unsuccessful performance was high.  *Id.*  Consistent with the CO's best value determination, GSA awarded the task order to TMR for a dollar value of approximately $43 million.  AR 2682.

**C.     The Prior Contract and the Parties' Joint Ventures**

As the RFQ explained, the task order at issue "represents a continuation of system life cycle support services for DeCA's Data Center and Enterprise Service Desk environments."  AR 576. Since April 2019, DeCA contracted with Advanced Alliant Solutions Team ("AAST") for IT services for a dollar value of approximately $27 million ("Incumbent Contract").  AR 2542.  The scope of work contemplated under the RFQ, however, was broader than the prior task order.  For example, the new task order requires onsite field service and cyber security support that the Incumbent Contract did not include.  AR 629, 2051, 2090, 2571; *see* AR 577.  This required a dedicated workforce not previously called for under the Incumbent Contract and an increased travel budget.  *Id.*; *see* Pl.'s Resp. to Def.'s Mot. to Suppl. the AR at 1, ECF No. 41.  Accordingly, the independent government estimate for the task order was much higher at roughly $44 million. AR 227.

AAST is a joint venture between TMR and 22nd Century Technologies, Inc. ("22nd Century").  AR 2542.  TMR is the managing partner of the joint venture.  AR 2049; Def.- Intervenor's Resp. to Interrogs. at 1–2, ECF No. 48.  While TMR technically acted as the prime contractor and 22nd Century acted as the subcontractor on the Incumbent Contract, 22nd Century served as the "lead."  ECF No. 48 at 2.  This meant that while TMR managed both the joint venture and the Incumbent Contract, 22nd Century provided most of the personnel, as well as performed and managed most of the billable work, either directly or through its subcontractor, [. . .].  Ex. 1 to

Pl.'s Am. Compl., Decl. of Satvinder Singh at 3, ECF No. 26-1; *see* ECF No. 48 at 3–4; Attach. C. to TMR's Resp. to Interrogs. at 1–3, ECF No. 48-3.   22nd Century also "served as the government customer's primary point of contact."  ECF No. 26-1 at 3.  For its part, TMR provided some full-time employees to perform billable work.  ECF No. 48 at 2–3; ECF No. 48-3 at 4–5.  It also provided non-billable support, including oversight activities, dedicated personnel who regularly met with DeCA as points of contact, filling staffing requirements, invoicing, travel requests, and other administrative functions.  ECF No. 48 at 3–4.  Of the almost $27 million earned on the Incumbent Contract, TMR's revenue amounted to about $2 million.  AR 2542; ECF No. 48 at 4.

In its quote for the task order at issue here, TMR listed the Incumbent Contract as one of three examples of its past experience.  AR 2049.  While TMR disclosed that it was the managing partner of AAST (the incumbent) and "work[ed] closely with 22nd Century and [. . .]" on the Incumbent Contract, it represented that it "managed [the] contract" and did not disclose that 22nd Century served as the lead, nor did it provide information on the breakdown of the work among the entities working on the contract.  *Id.*  TMR generally described the work of all entities working on the Incumbent Contract as being completed by "AAST/TMR," the "Team," or "AAST/TMR's Team."[2]  *See, e.g.*, *id.*

As it happens, 22nd Century is also a member of AccelGov, which is an unpopulated joint venture between 22nd Century, Agovx, and [. . .].  AR 931–32.  Accordingly, AccelGov also listed

---

[2] TMR used similar descriptions in its second past experience example, which related to a contract between AAST and the Naval Air Warfare Center Aircraft Division ("NAWCAD").  AR 2053.  Like the Incumbent Contract, there was a similar arrangement and breakdown of work between TMR and 22nd Century.  ECF No. 48 at 4–7.  22nd Century served as the "lead" on the NAWCAD contract, providing most of the personnel and billable work.  ECF No. 26-1 at 3; ECF No. 48 at 6.  Of the over $33 million earned on the NAWCAD Contract, TMR's revenue amounted to about $1 million.  AR 2053; ECF No. 48 at 6.

the Incumbent Contract as past experience in its quote.  AR 934.  It similarly referred to the work

on the contract as provided by AccelGov's "team," *see, e.g.*, *id.*, acting through 22nd Century and

[. . .] (as subcontractor), AR 931.

**D.    Procedural History**

On October 3, 2022, AccelGov filed its bid protest in this Court.  *See* Pl.'s Compl., ECF

No. 1.  On November 7, 2022, it filed its Amended Complaint and a Motion for Judgment on the

Administrative Record.  Am. Compl., ECF No. 26; Pl.'s Mot. for J. on AR, ECF No. 27.  AccelGov

alleges that: (1) GSA conducted an arbitrary and irrational evaluation under Factor 1; (2) GSA

evaluated offers unequally under Factor 1; (3) GSA conducted an arbitrary and irrational

evaluation under Factor 2; (4) TMR made material misrepresentations in its quote; and (5) GSA

made an arbitrary and irrational best value determination.  ECF No. 26 ¶¶ 47, 76, 86, 90, 96, 112,

115.  AccelGov asks the Court to permanently enjoin performance of the task order under the

current award, disqualify TMR from consideration on account of its material misrepresentations,

and require GSA to perform a new evaluation in accordance with the RFQ.  *Id.* at 35 ("Prayer for

Relief").  AccelGov subsequently abandoned its challenge to GSA's Factor 2 evaluation.  Pl.'s

Reply & Resp. to Cross-Mots. at 34, ECF No. 40.

On November 30, 2022, the Government and TMR filed Cross-Motions for Judgment on

the Administrative Record.  ECF No. 36; Def.-Intervenor's Cross-Mot. for J. on AR, ECF No. 32.

The Government and TMR argue that GSA reasonably and equally evaluated AccelGov's and

TMR's quotes, made a rational decision to award the task order to TMR based on its best value

determination, and that TMR made no material misrepresentations in its quote.  *See generally* ECF

No. 36; ECF No. 32.  Additionally, the Government argues that—even if TMR did make material

misrepresentations—AccelGov was not prejudiced because it cannot show that its "Marginal"

Factor 1 rating was arbitrary and capricious and thus that it was improperly excluded from further

consideration.  ECF No. 36 at 58–59.  As such, AccelGov does not have standing to raise its material misrepresentation claim.  *Id.*

In addition to dispositive motions, AccelGov and the Government each filed motions seeking to supplement the Administrative Record.  AccelGov moved for permission to serve four interrogatories related to TMR's alleged material misrepresentations.  Pl.'s Mot. to Conduct Disc. and Suppl. AR at 3, ECF No. 28.  AccelGov argued that, because the evidence necessary to establish TMR's material misrepresentations could be found only outside of the Administrative Record, it was entitled to limited discovery and supplementation.  *Id.* at 1–2.  The Government and TMR opposed the motion, disputing that the statements AccelGov identified in TMR's quote could support a material misrepresentation claim and arguing that discovery would not assist the Court in its review.  Def.'s Resp. to Pl.'s Mot. to Conduct Disc. & Suppl. AR, ECF No. 34; Def.-Intervenor's Resp. to Pl.'s Mot. to Conduct Disc. & Suppl. AR, ECF No. 33.

On December 14, 2022, the Court granted AccelGov's motion, concluding that it had made a plausible, non-speculative misrepresentation claim that warranted review of extra-record evidence.  Order Granting Pl.'s Mot. to Conduct Disc. at 5, ECF No. 39 at 7.  Noting the early stage of the case and reserving all merits-related questions for a later date, the Court ordered TMR to respond to AccelGov's four interrogatories seeking facts about TMR's involvement in the incumbent and NAWCAD contracts.  *Id.*  The Court also supplemented the Administrative Record with four documents AccelGov submitted related to TMR's work on these prior contracts.  *Id.*  On December 28, 2022, TMR filed its responses to AccelGov's interrogatories.  ECF No. 48.

The Government also filed a Motion to Supplement the Administrative Record, which seeks to include materials related to the Incumbent Contract.  Def.'s Mot. to Suppl. AR, ECF No. 35.  Although it claims that the award decision is "self-evidently rational on the basis of the administrative record," the Government argues that the Court cannot fully evaluate AccelGov's

arguments, which rely heavily on its work under the Incumbent Contract, without materials necessary to understand the differences between it and the task order at issue. *Id.* at 1  AccelGov opposes the motion, arguing supplementation is not necessary for effective judicial review.  ECF No. 41.  AccelGov "readily acknowledge[s] that there are differences between the incumbent contract and the current one" and argues that extra-record evidence is not necessary to resolve an undisputed issue.  *Id.* The Government's motion is currently pending and ripe for decision.

## II.  LEGAL STANDARDS

### A.  Motions for Judgment on the Administrative Record

RCFC 52.1(c) governs motions for judgment on the administrative record.  Such motions are "properly understood as . . . an expedited trial on the record." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005).  In contrast to the standard for summary judgment, "the standard for judgment on the administrative record is narrower" and involves determining, "given all the disputed and undisputed facts in the administrative record, whether the plaintiff has met the burden of proof to show that the [challenged action or] decision was not in accordance with the law." *Martinez v. United States*, 77 Fed. Cl. 318, 324 (2007) (citing *Bannum*, 404 F.3d at 1357).  Therefore, a genuine issue of disputed fact does not prevent the Court from granting a motion for judgment on the administrative record.  *See Bannum*, 404 F.3d at 1357.

### B.  Bid Protest Standard of Review

The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, provides the Court of Federal Claims with "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement . . . ." 28 U.S.C. § 1491(b)(1).  In such actions, the Court "review[s] the agency's decision pursuant to the standards set forth in section 706" of the Administrative Procedure Act.  28 U.S.C. § 1491(b)(4); *see Banknote Corp. of Am., Inc. v. United*

*States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004). Accordingly, the Court examines whether an agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 n.5 (Fed. Cir. 2001). Under such review, an "award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa*, 238 F.3d at 1332. To prevail in a bid protest, "a protestor must show a significant, prejudicial error in the procurement process." *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020) (quoting *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)). A protestor establishes prejudice by showing "that there was a substantial chance it would have received the contract award but for that error." *Alfa Laval*, 175 F.3d at 1367 (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996)).

In reviewing an agency's procurement decisions, the Court does not substitute its judgment for that of the agency. *See Redland Genstar, Inc. v. United States*, 39 Fed. Cl. 220, 231 (1997); *Cincom Sys., Inc. v. United States*, 37 Fed. Cl. 663, 672 (1997); *see also M.W. Kellogg Co. v. United States*, 10 Cl. Ct. 17, 23 (1986) (holding that "deference must be afforded to an agency's . . . procurement decisions if they have a rational basis and do not violate applicable law or regulations"). The disappointed bidder "bears a heavy burden," and the CO is "entitled to exercise discretion upon a broad range of issues . . . ." *Impresa*, 238 F.3d at 1332–33 (citations and quotes omitted). This burden "is not met by reliance on [the] pleadings alone, or by conclusory allegations and generalities." *Bromley Contracting Co. v. United States*, 15 Cl. Ct. 100, 105 (1988); *see Campbell v. United States*, 2 Cl. Ct. 247, 249 (1983). A procurement decision is rational if "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion."

*Impresa*, 238 F.3d at 1333.  "[T]hat explanation need not be extensive." *Bannum, Inc. v. United States*, 91 Fed. Cl. 160, 172 (2009) (citing *Camp v. Pitts*, 411 U.S. 138, 142–43 (1973)).

## C.    Standing in a Bid Protest

The Court has jurisdiction to hear a bid protest only if the protestor has the requisite standing.  *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009) (citing 28 U.S.C. § 1491(b)(1)).  To demonstrate standing, the plaintiff is required to establish that it is an interested party, meaning it "is an actual or prospective bidder[ ] and . . . possesses the requisite direct economic interest." *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006). To show a "direct economic interest," the plaintiff must show that it was prejudiced by the Government's alleged errors by proving it had a "substantial chance" of receiving the contract. *Myers Investigative and Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002). Stated another way, a plaintiff has standing to pursue a bid protest if it demonstrates that "but for the error[s]" challenged in the protest it "would have had a substantial chance of securing" the contract at issue.  *Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1378 (Fed. Cir. 2009); *see Alfa Laval*, 175 F.3d at 1367.

## D.    Supplementation of the Administrative Record

It is well settled that in a bid protest case "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379 (Fed. Cir. 2009) (quoting *Camp*, 411 U.S. at 142).  Therefore, "the parties' ability to supplement the administrative record is limited." *Id.*   Indeed, according to Federal Circuit precedent, courts should allow supplementation in record review cases only when "the omission of extra-record evidence precludes effective judicial review." *Id.* at 1380 (quoting *Murakami v. United States*, 46 Fed. Cl. 731, 735 (2000), *aff'd*, 398 F.3d 1342 (Fed. Cir. 2005)).  Supplementation or discovery is not

permissible "merely because the proponent of such measures believes that it will 'improve the court's "understanding" of a case.'" *Connected Glob. Sols., LLC v. United States*, 159 Fed. Cl. 801, 805 (2022) (quoting *NEQ, LLC v. United States*, 86 Fed. Cl. 592, 593 (2009)).

## III.   DISCUSSION

### A.   AccelGov Has Standing to Bring This Bid Protest.

The parties do not dispute that AccelGov has standing to pursue its Factor 1 evaluation claim. Tr. of Oral Arg. ("Tr.") at 85:11–18; 104:24–105:2, ECF No. 51. Instead, the Government argues that AccelGov does not have standing to bring its material misrepresentation claim. ECF No. 36 at 58–59.[3] It contends that, even if TMR were disqualified from receiving the task order because of any material misrepresentations, AccelGov would not have a substantial chance of receiving the award. ECF No. 36 at 58. That is because, according to the Government, AccelGov's "Marginal" Factor 1 rating was rational and, as required by the RFQ, took AccelGov out of the zone of consideration. *Id.* Thus, the Government argues AccelGov cannot demonstrate prejudice and accordingly lacks standing to challenge the procurement on that ground. *Id.* at 58–59.

Whether a protestor has standing in a bid protest is a threshold inquiry that must be addressed before reaching the merits of the claims. *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003); *see Warth v. Seldin*, 422 U.S. 490, 517–18 (1975). Even in the context of dispositive motions, the standing analysis requires the Court to accept the protestor's well-pleaded allegations of error in the procurement process to be true. *See, e.g.*, *Info. Tech.*, 316 F.3d at 1319 (finding the protestor had standing assuming it succeeded on all its protest grounds); *Am. Relocation Connections, LLC v. United States*, 789 F. App'x 221, 227–28 (Fed. Cir.

---

[3] Although the Government argued in its briefing that AccelGov lacked standing to bring any of its claims, *see* ECF No. 36 at 17–19, it clarified its position at oral argument and contended that AccelGov only lacked standing to bring claims beyond those attacking its "Marginal" Factor 1 rating. *See* Tr. at 54:22–55:5.

2019).  Although typically "standing is not dispensed in gross" and "a plaintiff must demonstrate

standing for each claim he seeks to press," *Davis v. Federal Election Comm'n,* 554 U.S. 724, 734,

(2008), the Government has not cited any cases requiring that a protestor show that each allegation

of procurement error in a bid protest was on its own prejudicial.  Indeed, in protests, courts appear

to evaluate the allegations of error as a whole when determining whether the protestor has satisfied

the standing requirement.  *See Beta Analytics Int'l, Inc. v. United States*, 67 Fed. Cl. 384, 396

(2005) (analyzing standing based on the protestor's "various challenges" to the procuring agency's

evaluation and ratings); *see Linc Gov't Servs., LLC v. United States*, 96 Fed. Cl. 672, 696 (2010),

*abrogated on other grounds by Safeguard Base Operations, LLC v. United States*, 989 F.3d 1326

(Fed. Cir. 2021) (standing inquiry looks at "the combined impact of all agency decisions *alleged*

to be unlawful" (emphasis in original)).

Accordingly, the Court will not conduct a bifurcated, piecemeal standing analysis, as the

Government suggests.  Rather, the Court finds that AccelGov has shown it would have had a

substantial chance of receiving the task order but for *all* alleged agency errors.  Taking as true that

GSA irrationally assigned AccelGov each of its weaknesses and unreasonably failed to credit

AccelGov with the numerous strengths that other offerors received, the CO could have rated

AccelGov as at least "Acceptable" under Factor 1.  AR 541 ("Acceptable" requires that the quote's

"weaknesses do not outweigh strengths").  Assuming that TMR's quote included material

misrepresentations, as AccelGov argues, TMR should have been excluded from consideration.  In

those circumstances, AccelGov would have been considered in the CO's comparative analysis

alongside [. . .] and [. . .].  AR 2678; *see* AR 538.  With only two other offerors in the zone of

consideration, one of which had lower Factor 2 and 3 ratings and both of which had substantially

higher price quotes, AccelGov would have had a "substantial chance" of receiving the task order.

*Myers Investigative & Sec. Servs.*, 275 F.3d at 1370; *see* AR 2665, 2677.  Accordingly, AccelGov

has demonstrated that is has standing to pursue this bid protest.

**B.      With One Exception, AccelGov Fails to Show that the CO Irrationally Assigned Weaknesses to AccelGov Under the Factor 1 Evaluation.**

AccelGov argues that GSA's evaluation of its quote was arbitrary and capricious because

the CO irrationally found four weaknesses in AccelGov's Factor 1 proposal.[4]  ECF No. 27 at 19–

20, 22–26.  The Government and TMR disagree.  ECF No. 36 at 11; ECF No. 32 at 8.  The Court

addresses each weakness in turn.

1.      The CO Rationally Assigned AccelGov a Weakness for Failing to Address All Aspects of the PWS.

The CO concluded that AccelGov's quote "did not address all aspects of the PWS, only

parroting the PWS without clearly articulating their approach or how they will accomplish the

PWS requirements."  AR 2571.  AccelGov argues this weakness was irrational as AccelGov

followed the format of the RFQ in its quote to describe its experience under each task and how it

would address each requirement.  ECF No. 27 at 19.  The Government and TMR argue that the

CO's assignment of this weakness was rational as AccelGov ignored certain requirements and

simply repeated the RFQ for other requirements without describing its methods for achieving the

objectives.  ECF No. 36 at 20–22; ECF No. 32 at 10–11.  In its Reply, AccelGov additionally

argues that the CO inadequately documented the basis for the weakness and that TMR's quote

---

[4] In its opening brief, AccelGov challenged each of the eight weaknesses identified by the TEB in its Factor 1 evaluation.  ECF No. 27 at 19–26.  In its Reply, AccelGov accepted the Government's argument that only the four weaknesses adopted by the CO could be arguably prejudicial to AccelGov, as those were the weaknesses that formed the basis of the CO's award decision.  ECF No. 36 at 18–19 (citing *WellPoint Mil. Care*, 953 F.3d at 1373); ECF No. 40 at 11. Since both parties agree on this point, the Court need not address the weaknesses that the CO did not adopt from the TEB report.

suffered from the same deficiencies (even though it did not similarly receive this weakness).  ECF No. 40 at 15–16.

Based on a review of AccelGov's quote, the CO was correct that AccelGov merely copied and pasted certain PWS requirements without explaining how it would meet the objectives.  As one of numerous examples, PWS Task 1, Subtask 1.1(b) required the contractor to "[p]rovide technical and functional activities required for full integration of all physical server, virtual server, and SAN environments."  AR 579.  AccelGov addressed this task by merely stating it would manage "technical and functional activities required for full integration of all physical server, virtual server, and SAN environments."  AR 950.  This was insufficient under the RFQ, which specifically advised that Factor 1 would consider each offeror's "technical approach" to evaluate whether it "understands the specific requirements of the PWS."  AR 538; *see* AR 539 (explaining that offerors would also be evaluated on "the adequacy of the proposed solution/approach" and the "completeness of their technical solutions").  The RFQ made clear that offerors could not simply state they were willing to perform the PWS requirement; they were required to "show they are capable of performing the work described in the PWS."  AR 534.  It was not irrational for the CO to conclude that such copy-and-paste responses by AccelGov did not demonstrate an adequate technical approach or provide assurance that it understood the PWS requirements.

AccelGov also failed to address certain tasks altogether.  To name a few examples, PWS Task 5, Subtask 5.1(k) required the contractor to "[m]anage the Asset Manager linkages between agency assets to include software licenses, leases, warranty, and support contracts."  AR 598.  An explanation of how AccelGov would achieve this task was absent from the section of AccleGov's quote related to Task 5, Subtask 5.1.  AR 961–62.  PWS Task 2, Subtask 2.2(d) required the contractor to "[m]aintain the agency's secure gateway appliances and/or applications."  AR 586.  AccelGov failed to address this task in the section of its quote related to Task 2, Subtask 2.2.  AR

954–55.  It was not irrational for the CO to conclude that failures such as these to address certain PWS tasks did not provide assurance that AccelGov understood the PWS requirements or provided an adequate and complete solution to these objectives.

AccelGov's arguments in response are unpersuasive.  It argues that it followed the same "formula" used in the PWS to organize its descriptions of how it would perform each PWS task.  ECF No. 27 at 19.  Following a similar organizational structure as the PWS, however, is not sufficient to demonstrate AccelGov's understanding of the PWS tasks, nor does it suffice to correct the inadequacies recognized by the CO.  AccelGov likewise points to other areas of its quote where it allegedly addressed two PWS requirements that were missing from the sections specifically related to the requirement.  But courts have frequently recognized that a procuring agency is not expected to hunt for potentially responsive information that is not included or not adequately presented in the relevant section of an offeror's proposal.  *See, e.g.*, *ST Net, Inc. v. United States*, 112 Fed. Cl. 99, 110 (2013).

Moreover, AccelGov's improper documentation and unequal evaluation arguments regarding this weakness were raised for the first time in its Reply.  Arguments not raised in an opening brief are waived.  *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006).  This includes arguments raised in a combined response and reply brief, if the arguments are not in response to arguments raised in the cross-motion.  *See Newimar S.A. v. United States*, 160 Fed. Cl. 97, 124 (2022); *Chenega Mgmt., LLC. v. United States*, 96 Fed. Cl. 556, 572 n.25 (2010).  AccelGov's newly raised arguments could have been raised in its opening brief and go beyond merely responding to arguments in the Government's or Intervenor's Cross-Motions.  Accordingly, the Court will not now consider them.

2.      The CO's Finding that AccelGov Failed to Provide a Complete Phase-In Plan was
        Irrational.

The CO found that AccelGov "did not provide a complete Phase-In Plan as they simply stated that they will utilize incumbent personnel to perform all tasks identified." AR 2571.  In the CO's estimation, AccelGov "failed to realize that the Field Service Plan and Cyber security are not presently included in the current contract, and therefore these tasks do not have 'incumbent' personnel."  *Id.*  AccelGov argues that the CO's stated bases are demonstrably wrong because AccelGov's quote addressed the field service plan and cyber security tasks and explained that it would hire personnel to fill new positions not required under the Incumbent Contract.  ECF No. 27 at 22–23.  The Government and TMR respond that AccelGov's quote did not sufficiently detail its approach to the new tasks and to new hiring so as to instill confidence in its Phase-In Plan.  ECF No. 36 at 27–29; ECF No. 32 at 15–16.

On this point, AccelGov is correct.  AccelGov included deliverables for the field service plan and cyber security (Tasks 4 and 7) in its Work Breakdown Structure, AR 969; it dedicated a section of its proposal to describing how it would address field service support, AR 973; and it listed personnel who were able to perform the cyber security task, *id.*  Accordingly, it was irrational for the CO to conclude that AccelGov "failed to realize" these tasks were unique to the new task order.[5]  AR 2571.

AccelGov also demonstrated its awareness of the need for new personnel and advised that it would hire employees to fill new tasks.  Specifically, AccelGov stated in its quote that, "[. . .]." AR 970.  It also stated, "[. . .]."  AR 968.  Moreover, AccelGov's staffing plan included the same

---

[5] AccelGov also argues that it should not have received this weakness because its Work Breakdown Structure included the same deliverables as TMR's, but TMR did not receive a corresponding weakness.  ECF No. 27 at 32.  Because the Court concludes that this weakness lacks a rational basis, it need not also decide whether GSA treated AccelGov and TMR unequally.

number of personnel as TMR's plan with respect to field service support and cyber security (Tasks 4 and 7). *Compare* AR 971, *with* AR 2087. Therefore, it was irrational for the CO to conclude that AccelGov intended to use only incumbent personnel to perform the task order. AR 2571.

The Government and TMR argue that even though AccelGov may have mentioned the new tasks and the need for new personnel, its descriptions of how it would achieve those tasks and hire new employees were vague and undetailed. ECF No. 36 at 26–29; ECF No. 32 at 14–16. Thus, they argue, it was not irrational for the CO to ascribe AccelGov a weakness for failing to properly address these requirements. ECF No. 36 at 27–29; ECF No. 32 at 15–16. But that was not the basis for the weakness as provided in the award decision. Rather, the CO gave AccelGov this weakness because he believed AccelGov "failed to realize" the need to address new tasks and hire new personnel. AR 2571. That reasoning finds no support in the record. Thus, the CO's assignment of this weakness lacked a rational basis.

3.  <u>The CO Rationally Assigned AccelGov a Weakness for Failing to Have Properly Certified Key Personnel.</u>

The CO concluded that AccelGov's "Key Personnel plan did not fully meet the Government's need of having certified personnel available to perform on Day 1 of the period of performance." AR 2571. In its Reply, AccelGov accepted the Government's methodology under Attachment 9 of the RFQ for determining personnel certification requirements and conceded that, under that methodology, certain AccelGov key personnel did not have the required certifications. ECF No. 40 at 22; *see* ECF No. 36 at 34–35.

AccelGov now argues that, even if AccelGov's personnel were not properly certified, TMR's quote suffered from the same defect; thus, this weakness was arbitrary and irrational because the CO treated AccelGov's and TMR's quotes unequally. ECF No. 40 at 23. Even assuming AccelGov's argument was not waived for being raised initially on reply, *see SmithKline*

*Beecham Corp.*, 439 F.3d at 1319, it would fail nevertheless.  The TEB originally assigned TMR a weakness to its Proposed Project Management Structure/Staffing Plan for failing to list all the necessary personnel certifications under Attachment 9.  AR 2426.  The RFQ, however, permitted GSA to communicate with TMR (as the apparent successful offeror) to address any concerns with its quote.  AR 542.  Before the CO conducted his comparative analysis, GSA reached out to TMR to get clarification regarding certifications, and TMR confirmed to GSA's satisfaction that its personnel would comply with the Attachment 9 requirements.  AR 2503–10.  Accordingly, the CO concluded that TMR had resolved this weakness.  AR 2650, 2664.

Especially in light of AccelGov's acknowledgement that not all its personnel had the required certifications under the controlling version of Attachment 9, the CO did not act irrationally in assigning AccelGov a weakness for its key personnel proposal.

4.     The CO Rationally Assigned AccelGov a Weakness for Failing to Adequately Address the Required Field Service Requirements.

The CO found that AccelGov's "Field services approach did not fully capture [certain] field service requirements outline[d] in the PWS."  AR 2571 (citing tasks C.5.1, C.5.2, and C.5.4). He also concluded that AccelGov's approach "did not adequately demonstrate there will be a dedicated traveling team . . . to provide Field Services On-Site support for Tasks C.5.4.3 (a) through (b)."  *Id.* (noting AccelGov's approach of deploying the field service team for [. . .] and to respond to [. . .]).  AccelGov argues that the CO's determination was irrational because (1) AccelGov's field services proposal did not limit on-site support only to these two circumstances, and (2) nothing in the RFQ or Q&As foreclosed the need for on-site support following [. . .].  ECF No. 27 at 26.  The Government and TMR argue that AccelGov misconstrues the basis of this weakness, which was that AccelGov failed to describe an approach for meeting the new field service requirements that were not found in the Incumbent Contract.  ECF No. 36 at 37 (explaining

that C.5.4.3(a) and (b) are new to the solicitation and not included in the prior contract); ECF No. 32 at 21.

The Government and TMR are correct that AccelGov did not receive this weakness simply because it proposed field service support to respond to [. . .] and [. . .].  Although the CO's explanation may have emphasized these two phrases from AccelGov's proposal, the CO's broader concern was AccelGov's failure to address the full breadth of the field service requirements.  AR 2571.  The CO specifically pointed to PWS Task 4, Subtasks 4.3(a) and 4.3(b), which required "on-site service desk support," "OS/application/equipment support, . . . support for Lifecycle replacements, software upgrades, equipment inventories, resolving any unfinished incidents/work orders, warranty support and conducting quality assurance/customer surveys"—tasks largely unaddressed in AccelGov's quote.  *Compare* AR 595, *with* AR 973.  Aside from stating an incomplete list of the on-site support that would be required, AccelGov's approach referred only to the work "Field Support provides" to respond to [. . .], presumably using the present tense to refer to work on the Incumbent Contract.  AR 973.  Field service support through dedicated field service personnel was, however, a new requirement.  AR 629 (Q&As 69, 73).  Accordingly, it was not irrational for the CO to assign a weakness to AccelGov for failing to adequately address its approach for meeting all the PWS field service support requirements.[6]

## C.     With One Exception, AccelGov Fails to Show That GSA Treated It Unequally Regarding Certain Strengths Assigned to Other Offerors.

AccelGov also argues that the CO evaluated its quote unequally compared to other offerors. ECF No. 27 at 27–32.  Specifically, AccelGov argues that it should have received several strengths

---

[6] In its Reply, AccelGov additionally argues that TMR proposed a smaller field service support team than AccelGov but did not receive a weakness from the CO; thus, neither offeror should have received a weakness.  ECF No. 40 at 23–24.  Even if this belated argument was not waived, *see SmithKline Beecham Corp.*, 439 F.3d at 1319, it is unpersuasive since the basis of AccelGov's weakness was unrelated to the size of its proposed team.

that other offerors received because AccelGov proposed the same or similar approaches under Factor 1. *Id.* at 27–31. It likewise argues that it should not have received certain weaknesses because TMR's quote suffered from the same alleged deficiencies but did not receive such weaknesses. *Id.* at 31–32.

To prevail on a claim of disparate evaluation, a protestor must show that the agency unreasonably downgraded its proposal for deficiencies that were "substantively indistinguishable" from or "nearly identical" to those contained in other proposals. *Office Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020) (citing *Enhanced Veterans Sols., Inc. v. United States*, 131 Fed. Cl. 565, 588 (2017)); *Red River Comput. Co. v. United States*, 120 Fed. Cl. 227, 238 (2015). The same "substantially indistinguishable" or "nearly identical" standard applies when a protestor alleges an agency unequally assessed strengths and weaknesses in offerors' proposals. *Ascendant Servs., LLC v. United States*, 160 Fed. Cl. 275, 290–91 (2022). A protestor also may prevail by showing the agency inconsistently applied objective solicitation requirements to it and the other offerors. *Sci. Applications Int'l Corp. v. United States*, 108 Fed. Cl. 235, 272 (2012) (citing *BayFirst Sols., LLC v. United States*, 102 Fed. Cl. 677 (2012)). If a protestor does not meet this threshold showing, then the court should dismiss the claim, otherwise it "would give a court free reign to second-guess the agency's discretionary determinations underlying its technical ratings." *Office Design Grp.*, 951 F.3d at 1372.

With one exception, AccelGov fails to make the necessary showing because the aspects of the proposals identified in its quote are not substantively identical to those contained in TMR's and other offerors' quotes.

1.      TMR's and AccelGov's Proposed Test Environments Are Not Substantively Indistinguishable.

The TEB gave TMR a strength for its proposed "test environment . . . maintained for [. . .]."  AR 2522.  AccelGov argues it should have received this strength because it also proposed a test environment.  ECF No. 27 at 27–28 (quoting AR 956).  AccelGov's proposed test environment is not substantively indistinguishable from TMR's.  TMR stated its test environment would be "maintained for [. . .]."  AR 2071.  TMR included this explanation in the section of its quote addressing Task 4—Enterprise Service Desk Support, AR 2071, which "includes all support, maintenance and security compliance of the hardware and software within the desktop common operating environment," AR 591.  The TEB concluded that the use of TMR's test environment in response to Task 4 gave it "high confidence" TMR would "introduce new software/applications into DeCA's computing environment without causing any disruptions to operations."  AR 2522.

While AccelGov also proposed a test environment, its environment was in response to Task 3—Database Management Support, not Task 4, and would involve "[. . .]," not [. . .].  AR 956.  AccelGov's test environment was thus proposed in response to a different task than TMR's and involved upgrades of different technology.  Accordingly, AccelGov and TMR's test environments are not substantively indistinguishable, and GSA did not unequally evaluate their quotes in this respect.

2.      TMR's and AccelGov's Proposed Hotlines Are Not Substantively Indistinguishable.

The TEB awarded TMR a strength for its proposed "SD [Service Desk] Hot Line" that would allow TMR to "respond[] promptly to CG [Command Group] needs."  AR 2522.  In the TEB's assessment, TMR's hotline "reduces the risk . . . of having significant delays in providing direct support to DeCA's executive leadership and designated personnel."  *Id.*  AccelGov argues it should have received this strength because it also proposed a [. . .] hotline as part of its VIP

support approach.  ECF No. 27 at 28 (citing AR 959).  AccelGov's hotline, however, would [. . .],

AR 959, whereas TMR's hotline would [. . .], AR 2071.  It was not unreasonable for the TEB to

conclude that a [. . .] would have a higher probability of reducing delays in providing VIP support.

*Office Design Grp.*, 951 F.3d at 1372.  TMR's and AccelGov's proposed hotlines are therefore not

substantively indistinguishable, and GSA did not unequally evaluate their quotes by failing to

assign AccelGov a strength in this respect.

       3.    <u>AccelGov's Proposal to Have Key Personnel Ready to Perform on Day 1 Is Not
            Substantively Indistinguishable from TMR's and [. . .]'s Proposals to Do the Same.</u>

The TEB credited both TMR and [. . .] with a strength for demonstrating the ability to have

key personnel available on Day 1 of contract performance.  AR 2349, 2523.  The TEB explained

that it assigned this strength to TMR because TMR stated in its quote that "[a]ll Phase-In Personnel

will be onsite at DeCA Headquarters the first day after Award."  AR 2523.  This gave the TEB

"high confidence in [TMR's] ability to seamlessly transition operations."  *Id.*  It explained that it

assigned the strength to [. . .] because, as part of its detailed Phase-In Plan, [. . .] "demonstrated

the ability to have key personnel available on day 1."  AR 2349.  AccelGov argues it should have

received this strength because its quote stated that all incumbent employees would be transitioned

on Day 1 and that AccelGov's key personnel would likewise be ready to start on Day 1.  ECF No.

27 at 28 (citing AR 970, 973).

Although all three offerors stated that key personnel would be available on Day 1, their

key personnel proposals themselves were not substantively indistinguishable.  Unlike TMR and [.

. .], both of which received strengths for their key personnel plans, AccelGov received weaknesses

for failing to demonstrate that AccelGov's key personnel had the necessary security clearance

status and met the RFQ's certification requirements.  *Compare* AR 2350, 2525, *with* AR 2278.

The CO likewise noted a weakness in AccelGov's proposed key personnel.  AR 2571.  It was,

therefore, not irrational for the CO to withhold a strength from AccelGov in this respect where he had determined (rationally so) that AccelGov's quote "did not fully meet the Government's need of having *certified* personnel available to perform on Day 1." *Id.* (emphasis added); *see supra* § III.B.3. And in the same vein, the agency did not treat TMR and [. . .] more favorably by giving them a strength where their key personnel plan did not suffer from the same weakness.[7] AR 2350, 2524–25.

AccelGov argues that this reasoning was not expressly set forth in the TEB report or the CO's decision, and "[t]he Agency cannot rely on unwritten reasons for its analysis." ECF No. 40 at 26 (citing *AshBritt, Inc. v. United States*, 87 Fed. Cl. 344, 370, *op. clarified*, 87 Fed. Cl. 654 (2009)). First, both the TEB and CO explained that a weakness was assigned to AccelGov for proposing key personnel who lacked the required certifications to perform under the task order. AR 2278, 2571. And the CO specifically explained that such weakness made him conclude that AccelGov would not have "certified [key] personnel" available on Day 1. AR 2571. The agency's decisional path is thus readily discernible. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Second, AccelGov has not pointed to any requirement in the RFQ (or other source of authority) that required the CO to explain in writing why a quote *did not* receive a certain strength that another offeror's quote did. It would be inappropriate for the Court to penalize the CO for, in essence, failing to prove a negative in his award decision, especially where he was not under any obligation to do so.

---

[7] As explained above, the CO found that TMR had sufficiently resolved any concerns about personnel certifications. AR 2650, 2664.

4. <u>TMR's, [. . .]'s, and AccelGov's Integrated Master Schedules Are Not Substantively Indistinguishable.</u>

The TEB ascribed TMR a strength for providing a "very thorough/detailed Integrated Master Schedule providing the government with all Phase-In activities in advance which sets expectations throughout the 30-day Phase-In period." AR 2523. The TEB likewise gave [. . .] a strength for providing a "comprehensive Phase-In Integrated Master Schedule detailing activities to be completed with their respective timelines." AR 2349. AccelGov argues it should have received the same strength because it also proposed a detailed integrated master schedule. ECF No. 27 at 28–29 (citing AR 969). As the Government correctly notes, however, TMR's schedule proposed [. . .], which AccelGov's did not, and it explained [. . .]. *Compare* AR 2081, *with* AR 969; *see* ECF No. 36 at 44–45. [. . .]'s schedule also included [. . .] that AccelGov's did not. *Compare* AR 1419–20, *with* AR 969; *see* ECF No. 36 at 51. Thus, TMR's, [. . .]'s, and AccelGov's integrated master schedules are not substantively indistinguishable, and GSA did not unequally evaluate their quotes by failing to assign AccelGov a strength in this respect.

5. <u>TMR's and AccelGov's Communication Strategies are Not Substantively Indistinguishable.</u>

The TEB awarded TMR a strength because "TMR's PM [Program Manager], Project Manager, and TLs [Task Leads] will communicate in an open environment (i.e., transparency) through e-mails, in-person, meetings, and calls." AR 2524, *see* AR 2085. According to the TEB, this gave "the government high confidence in [TMR's] ability to provide consistent communication throughout the tenure of the contract." AR 2524. AccelGov argues it should have received the same strength because it also proposed to communicate "in an open environment with e-mails and calls." ECF No. 27 at 29 (quoting AR 970). The descriptions of AccelGov's and TMR's management communication strategies are admittedly similar in some respects. TMR, however, provided more detail about who would participate in communication activities and

proposed additional communication methods.  For example, while AccelGov referred generally to "Team AccelGov," AR 970, TMR specified that its Program Manager, Project Manager, and Task Leads would all maintain open communication, AR 2085.  TMR also proposed [. . .], in addition to the [. . .] that both TMR and AccelGov proposed.  *Id.*; AR 970.  That those details increased the TEB's confidence in TMR's ability to communicate was a judgment call that was well within its discretion and not unreasonable.  *Office Design Grp.*, 951 F.3d at 1372.  Accordingly, TMR's and AccelGov's communication strategies are not substantively indistinguishable, and GSA did not unequally evaluate their quotes by failing to assign AccelGov a strength in this respect.

6.    TMR's and AccelGov's Staffing Charts Are Not Substantively Indistinguishable.

The TEB ascribed TMR a strength because its "Notional Team Management Structure Organization Staffing Chart outlines a detailed Staffing Plan for all major areas required by the PWS."  AR 2524.  This gave the TEB confidence that TMR "has a firm understanding of DeCA's requirements" and the "ability to interpret DeCA's needs and implement staffing/personnel accordingly."  *Id.*  AccelGov argues it should have received the same strength because it also included a detailed staffing chart in its proposal.  ECF No. 27 at 29–30 (citing AR 971).  Unlike AccelGov's chart, however, TMR [. . .], it provided details as to [. . .], and it demonstrated [. . .]." *Compare* AR 2087, *with* AR 971.  Accordingly, TMR's and AccelGov's staffing charts are not substantively indistinguishable, and GSA did not unequally evaluate their quotes by failing to assign AccelGov a strength in this respect.

7.    TMR's and AccelGov's Key Personnel Proposals Are Not Substantively Indistinguishable.

The TEB gave TMR a strength because it believed "TMR's proposed key personnel have current security certifications, and successful background checks and are prepared to support this contract from day one."  AR 2525.  In the TEB's opinion, this lowered the risk of TMR "not having

qualified personnel available to perform the requirements" of the RFQ.  *Id.*  AccelGov argues that because its quote represented that "[a]ll of our proposal Key Personnel have satisfactory IT sensitivity background investigation[s] and [are] ready to start from day 1," it should have received the same strength.  ECF No. 27 at 30 (quoting AR 973); *see* ECF No. 40 at 31 (quoting AR 972) (stating that AccelGov would use "cleared" incumbent personnel).  TMR, however, revealed through its key personnel's resumes that each individual had secret level security clearance, which was an RFQ requirement.  AR 2094–2119; *see* AR 621–22.  The resumes of AccelGov's key personnel did not indicate whether they had security clearances and, if so, at what level.  AR 974–1004.  Moreover, simply stating that the key personnel had satisfactory background investigations was not sufficient, as such is not equivalent to obtaining a security clearance.  Because TMR's quote assured GSA through its key personnel resumes that its personnel had the required security clearance, while AccelGov's did not, TMR's and AccelGov's key personnel proposals are not substantively indistinguishable.  Thus, GSA did not unequally evaluate their quotes by failing to assign AccelGov a strength in this respect.

8.      [. . .]'s and AccelGov's Proposals to Assume Full Responsibility for PWS Tasks by Day 30 Are Substantively Indistinguishable.

The TEB credited [. . .] with a strength because "Team [. . .] assumes full responsibility for the PWS tasks by the 30th day of the Period of Performance."  AR 2349.  AccelGov argues it should have received the same strength because, consistent with the RFQ's requirement, AccelGov proposed to conduct a transition readiness review where it would "provide a final check before assuming full contract responsibility" on Day 30.  ECF No. 27 at 30 (quoting AR 969).  The Government points to no substantive difference between these proposals and instead argues that AccelGov does not have standing to bring this unequal treatment claim.  ECF No. 36 at 50.  As

explained above, AccelGov has demonstrated standing to bring all claims raised in this protest. *See supra* § III.A.

TMR argues that it was irrational for GSA to award *any offeror*, including [. . .], a strength merely for meeting a RFQ requirement.  ECF No. 32 at 27.  While it is possible this strength would hold little weight in the CO's ultimate determination on account of it being a basic RFQ requirement, that does not alter GSA's responsibility to treat offerors equally.  *See Office Design Grp.*, 951 F.3d at 1372.  Thus, if [. . .] received this strength, so too should have AccelGov, so long as [. . .]'s and AccelGov's proposals were substantively indistinguishable.  *Id.*  As neither the Government nor TMR points to any difference between [. . .]'s and AccelGov's proposals to assume full responsibility for the PWS tasks by Day 30, the Court concludes that GSA irrationally failed to assign AccelGov a strength for its substantively indistinguishable proposal.

9.    [. . .]'s and AccelGov's Field Service Support Plans Are Not Substantively Indistinguishable.

The TEB awarded [. . .] a strength because it believed [. . .] would "provide a dedicated Field Service Team of [. . .] technicians to [. . .]." AR 2390.  The TEB noted that [. . .]'s proposal assured GSA that it "understands Field Services is an entirely separate mission that requires experienced technicians who have the ability to travel to identified sites to perform" various tasks. *Id.*  AccelGov argues that since it also proposed a team of field support technicians, it should have received the same strength.  ECF No. 27 at 31 (citing AR 973).  However, unlike AccelGov, [. . .] specified that its technicians would be [. . .] technicians and stated its technicians would perform additional tasks unmentioned by AccelGov, such as [. . .].  *Compare* AR 1759, *with* AR 973. Accordingly, [. . .]'s and AccelGov's field service support plans are not substantively indistinguishable, and GSA did not unequally evaluate their quotes by failing to assign AccelGov a strength in this respect.

      10.    <u>AccelGov Was Not Treated Unequally from TMR for Receiving a Weakness for Its Cloud Migration Plan.</u>

The TEB assigned AccelGov a weakness for failing to provide adequate detail regarding its cloud migration plan.  AR 2276.  AccelGov notes that TMR's quote did not address cloud migration at all, but TMR did not receive a corresponding weakness from the TEB.  ECF No. 27 at 31.  There is no dispute, however, that the CO did not adopt this weakness in his award decision.  ECF No. 32 at 30; ECF No. 40 at 11; *see* AR 2571.  Accordingly, this weakness did not prejudice AccelGov and thus cannot form the basis of a disparate treatment claim.  ECF No. 40 at 11; *see WellPoint Mil. Care*, 953 F.3d at 1380.

**D.**    **AccelGov Cannot Demonstrate It Was Prejudiced by GSA's Factor 1 Evaluation or Any Material Misrepresentations.**

To prevail in a bid protest, the protestor must establish "a significant, prejudicial error in the procurement process" by demonstrating that but for the Government's errors it would have had a "substantial chance" of receiving the contract.  *Alfa Laval*, 175 F.3d at 1367 (quoting *Statistica*, 102 F.3d at 1581–82).  AccelGov has established that GSA erred by arbitrarily and capriciously assigning it a weakness for its Phase-In Plan and failing to assign it a strength for assuming responsibility for all PWS tasks by Day 30.  If GSA had not made these errors, however, AccelGov still would have received three weaknesses and only one strength under Factor 1.  Thus, AccelGov still would have received a "Marginal" Factor 1 rating and would not have been considered in the CO's comparative analysis.  AR 541, 2678.

This would be so even if TMR were disqualified from receiving the task order on account of the material misrepresentations alleged by AccelGov.  As AccelGov concedes, had TMR been disqualified, the CO would have selected [. . .] or [. . .] for the task order award, as they each earned acceptable ratings or higher for the non-price factors.  Tr. at 19:5–19:12; *see also* AR 2678.  Therefore, because AccelGov cannot demonstrate it would have been prejudiced by TMR's

alleged material misrepresentations, the Court need not examine the validity of this contention. *See Linc Gov't Servs.*, 96 Fed. Cl. at 707 (holding that it was not necessary to address protestor's final alleged errors that could not collectively demonstrate prejudice).

Because AccelGov cannot show that—but for the two errors it demonstrated in GSA's evaluation—it would have had a substantial chance of receiving the task order, its protest must fail.

**E.      No Injunctive Relief Is Warranted Because AccelGov Fails on the Merits.**

A party seeking permanent injunctive relief must show that: (1) it "has succeeded on the merits of the case;" (2) it "will suffer irreparable harm if the court withholds injunctive relief;" (3) "the balance of hardships to the respective parties favors the grant of injunctive relief;" and (4) "it is in the public interest to grant injunctive relief." *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004). Because AccelGov has not succeeded on the merits of its protest, no injunctive relief is warranted in this case. *See Mitchco Int'l, Inc. v. United States*, 26 F.4th 1373, 1384 n.7 (Fed. Cir. 2022); *ANHAM FZCO v. United States*, 149 Fed. Cl. 427, 439 (2020) (quoting *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 999 (Fed. Cir. 2018)).

**F.      Supplementation of the Administrative Record with Materials Related to the Incumbent Contract Is Not Necessary for Effective Judicial Review.**

In addition to moving for judgment on the administrative record, the Government moved to supplement the Administrative Record with documents related to the Incumbent Contract, which it claims are necessary for "full judicial review" of AccelGov's arguments. ECF No. 35 at 2. According to the Government, the materials demonstrate that the task order at issue substantively differs from the Incumbent Contract in significant ways. Specifically, the RFQ included additional tasks and subtasks, required more full-time employees, had an increased travel budget, and contemplated substantially more on-site IT support. *Id.* at 3. The fact that the two task orders are

not identical is, however, reflected in the Administrative Record.  AR 2051, 2090, 2571; *see* AR 577.  It also is undisputed.  ECF No. 27 at 23; ECF No. 41 at 1.  Delving into the intricacies of the Incumbent Contract, as compared to the RFQ, is simply unnecessary to make the Government's point and for the Court to conduct meaningful judicial review of the CO's award decision based on the record that was before him.  Nor will the Court risk having the extra-record materials transform the arbitrary-and-capricious review applicable to this bid protest "into effectively de novo review."  *Parcel 49C Ltd. P'ship v. United States*, 130 Fed. Cl. 109, 121 (2016) (quoting *Axiom*, 564 F.3d at 1380) (internal quotation marks omitted).  Accordingly, the Government's supplementation request is denied.

## IV. CONCLUSION

For the reasons set forth above, the Court **DENIES** AccelGov's Motion for Judgment on the Administrative Record (ECF No. 27), **GRANTS** the Government's Cross-Motion for Judgment on the Administrative Record (ECF No. 36), **GRANTS** TMR's Cross-Motion for Judgment on the Administrative Record (ECF No. 32), and **DENIES** the Government's Motion to Supplement the Administrative Record (ECF No. 35).  The Clerk is directed to enter judgment accordingly.

This opinion and order will be unsealed in its entirety after February 10, 2023, unless the parties submit **by no later than February 8, 2023**, an objection specifically identifying the protected information subject to redaction.  Any objecting party must submit a proposed redacted version of the decision and provide the reason(s) supporting the party's request for redaction.

**SO ORDERED**.

Dated: January 31, 2023                          */s/ Kathryn C. Davis*
                                                    KATHRYN C. DAVIS
                                                    Judge